IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| TRUDY K. LEAPALDT, | |
| Plaintiff, | 8:13-CV-32 |
| vs. | |
| CAROLYN W. COLVIN, Acting Commissioner of the Social Security Administration, | MEMORANDUM AND ORDER |
| Defendant. | |

      This matter is before the Court on the denial, initially and upon reconsideration, of plaintiff Trudy K. Leapaldt's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq*. The Court has considered the parties' filings and the administrative record. Finding the Commissioner's development of the record inadequate, the Court reverses and remands for further proceedings.

## PROCEDURAL BACKGROUND

      Leapaldt applied for disability insurance benefits in February 2010. T11, 118, 142.[1] Her claim was denied initially and on reconsideration. T67–72, 76–79. Leapaldt appealed the decision and requested a hearing from an administrative law judge (ALJ). The ALJ held a hearing on November 30, 2011 and a supplemental hearing on January 13, 2012. T27–57, 58–66. In a decision dated March 23, 2012, the ALJ found that Leapaldt was not disabled as defined under 42 U.S.C. §§ 416(i) or 423(d), and therefore not entitled to benefits. T8–26.

      To determine whether a claimant is entitled to disability benefits, the ALJ performs a five-step sequential analysis. 20 C.F.R. § 404.1520(a)(4). At step one, the claimant has the burden to establish that she has not engaged in substantial gainful activity since her alleged disability onset date. *Id.*; *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006). If the claimant has engaged in substantial gainful activity, she will be found not to be disabled;

---

[1] All citations to the administrative record (filings 7 through 7-7) are given as "T [Transcript]" followed by the page number.

otherwise, at step two, she has the burden to prove she has a medically determinable physical or mental impairment or combination of impairments that significantly limits her physical or mental ability to perform basic work activities. *Gonzales*, 465 F.3d at 894.

At step three, if the claimant shows that her impairment meets or equals a presumptively disabling impairment listed in the regulations, she is automatically found disabled and is entitled to benefits. *Id.* Otherwise, the analysis proceeds to step four, but first, the ALJ must determine the claimant's residual functional capacity (RFC), which is used at steps four and five. 20 C.F.R. § 404.1520(a)(4). A claimant's RFC is what she can do despite the limitations caused by any mental or physical impairments. *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007). At step four, the claimant has the burden to prove she lacks the RFC to perform her past relevant work. *Gonzales*, 465 F.3d at 894. If the claimant can still do her past relevant work, she will be found not to be disabled; otherwise, at step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy the claimant can perform. *Id.*

Leapaldt alleged disability primarily as a result of visual impairments caused by Duane syndrome and cataracts,[2] and the headaches caused by those conditions, as well as asthma, chronic obstructive pulmonary disease, and depression. T14, 16, 35–36, 146. Leapaldt alleged a disability onset date of December 14, 2009. T142. On March 23, 2012, the date of the ALJ's decision, Leapaldt was 56 years old. T27, 118, 142.

In this case, at step one, the ALJ found that Leapaldt had not engaged in substantial gainful activity since her alleged onset date. T14. At step two, the ALJ found that Leapaldt had two severe impairments: Duane syndrome and a history of asthma. T14–15. Next, at step three, the ALJ found that

---

[2] Duane syndrome (also called Duane's syndrome or Duane retraction syndrome) refers to "a group of eye muscle disorders that cause abnormal eye movements." Am. Ass'n for Pediatric Ophthalmology and Strabismus (AAPOS), *Duane Syndrome*, http://www.aapos .org/terms/conditions/46 (last visited January 22, 2014). Persons with Duane syndrome have difficulty rotating one or both eyes outward (abduction), inward (adduction), or both. *Id.* The disorder is congenital, and is caused by a "miswiring" of the eye muscles—that is, a failure of the nerves that control the eye muscles to develop properly. *Id.* Persons with Duane syndrome may maintain a slight head tilt or turn to keep their eyes straight. *Id.* While there is no cure, surgery is sometimes an option. The surgery does not restore function of the affected nerves and muscles, but instead consists of adjusting other eye muscles to compensate. *Id.*

Leapaldt's impairments, considered singly and in combination, did not meet or medically equal a listed impairment.[3] T15.

The ALJ found that Leapaldt had the RFC to perform light work, as defined in 20 C.F.R. § 404.1567(b), although Leapaldt was further limited to work "involving lifting 25 pounds occasionally and 15 pounds frequently and never climbing ladders, ropes, or scaffolds." T15. The ALJ further found that Leapaldt "should avoid concentrated exposure to extremes of fumes, odors, dusts, gases, poor ventilation, and hazards such as unprotected heights or dangerous machinery" and that she could not work in a job which required her to drive. T15.

At step four, the ALJ found, based on the testimony of a vocational expert, that Leapaldt was able to perform her past relevant work. T19, T47–56, 60–65. In the alternative, the ALJ proceeded to step five, where he found that Leapaldt could perform other jobs that existed in significant numbers in the national economy. T19–20. So, the ALJ found that Leapaldt was not disabled. T21.

On November 30, 2012, the Appeals Council of the Social Security Administration denied Leapaldt's request for review. T1–4. Leapaldt's complaint (filing 1) seeks review of the ALJ's decision as the final decision of the Commissioner under sentence four of 42 U.S.C. § 405(g).

## FACTUAL BACKGROUND
### I. Pre-Onset Date Medical and Work History

As noted above, Leapaldt has Duane syndrome. She can move her eyes up and down, but cannot move them laterally, so she has to turn her head rather than simply move her eyes. T36, 295, 350–51. This is a congenital disorder which Leapaldt has experienced since childhood. T36, 295.

Briefly stated, Leapaldt claims that as she has aged, her vision has continued to decline. She claims that during the period of disability, she could only read, use a computer, or watch television for a short time before her vision would become too blurry to continue. And Leapaldt maintains that as a result of straining to see, she would often suffer debilitating headaches.

However, for much of her life, these symptoms were not present or not as severe, and did not prevent Leapaldt from working. From 1976 until the late 1980s she worked as a patient account manager, and from 1994 to 2000 she worked as an invoice clerk. T157, 233, 295. From 2000 to 2001 Leapaldt worked in billing or collections for various companies. T233. And from 2002 to

---

[3] Leapaldt's appeal focuses on her visual limitations. She does not dispute the ALJ's finding that her other impairments are not severe, nor does she allege that the RFC failed to account for her asthma.

- 3 -

June 2007 she owned and operated a sleep center with her husband, where she worked as an office manager. T157, 232, 276. Most of her jobs were full-time and involved working on a computer. T158–161, 232–233. From 2007 to 2008 she also worked part-time at a coffee shop. T232.

In July 2007, Leapaldt and her husband sold the sleep center. She stayed on as a manager and helped train the new employees. T41, 157, 232, 276. Leapaldt was eventually laid off in March 2008. T41, 276.

Leapaldt returned to work, very briefly, in December 2009. On December 8, she began working at a job that required her to use a computer to work with spreadsheets. T42, 232, 276. Leapaldt claims she developed a severe headache and could not see well enough to drive, and her husband had to pick her up. She did not return to the job. T42, 232.

## II. Medical and Disability Records: 2009–2011

In September 2009, Leapaldt met with ophthalmologist Marianne Diego-Wright, M.D. T241. Leapaldt complained of double vision in her right eye.[4] T241. Diego-Wright apparently performed the standard visual acuity tests, but the Court cannot tell what conclusion Diego-Wright reached regarding Leapaldt's visual acuity. The Commissioner reads the chart as stating that Diego-Wright measured Leapaldt's vision as "20/50 and 20/40." Filing 17 at 2. Although this is not apparent from the Court's reading of the chart, Leapaldt has not objected to this characterization of the record. In any event, Diego-Wright provided Leapaldt a new prescription for glasses. T241.

Diego-Wright also assessed Leapaldt with nuclear sclerosis in her left eye ("NS OS"). T241 This is an age-related change to the eyes, "caused primarily by the hardening and yellowing of the lens over time. 'Nuclear' refers to the gradual clouding of the central portion of the lens, called the **nucleus**; 'sclerotic' refers to the hardening, or **sclerosis**, of the lens nucleus." Tina D. Turner, FamilyConnect, *Are There Different Types of Cataracts?*, http://www.familyconnect.org/parentsite.aspx?FolderID=6&SectionID=112&DocumentID=5676 (last visited January 22, 2014). A nuclear sclerotic cataract is a common, age-related cataract. *Id.* Diego-Wright's assessment was "obs[erve]

---

[4] The record contains several ophthalmological / optometric charts from Leapaldt's visits to Diego-Wright and her later visits to an optometrist. *See* T240–41, 350–51. The charts contain many ophthalmological and medical abbreviations. The Court has been able to decipher most of these by utilizing various resources. *See, e.g.*, Bryan Kim, Univ. of Ill. at Chi. Dep't of Ophthalmology & Visual Sciences, *Commonly Used Ophthalmology Abbreviations*, http://chicago.medicine.uic.edu/UserFiles/Servers/Server_442934/File/OPHTHALMOLOGY/ophthalmic%20dictionary_alphabetical_2011.pdf (last visited January 22, 2014); Univ. of Ill. at Chi., Ophthalmology Residents' Web Page, *Reading and Writing Ophthalmology Notes*, http://www.uic.edu/com/ophres/readnotes.htm (last visited January 22, 2014).

cataract for now." T241. Previously, in 2007, Leapaldt underwent surgery to extract a cataract in her *right* eye. She later reported that the surgery was not that helpful. T243, 297, 316.

Leapaldt saw Diego-Wright again on December 15, 2009 (7 days after her unsuccessful attempt to return to work). T240. Leapaldt reported that she could not see well after using a computer for a couple of hours. T240. Diego-Wright observed no change in Leapaldt's visual acuity. T240. ("MR [manifest refraction] no Δ.") She noted that Leapaldt "can't read well binocular." T240. Diego-Wright referred Leapaldt to another doctor, but it is not clear if Leapaldt ever visited that doctor, and the record contains no notes from him.

In March 2010, Leapaldt responded to several questionnaires from the Social Security Administration. Her husband completed most (if not all) of the reports she submitted. *See, e.g.*, T146, 164, 172, 196. Leapaldt described her daily activities: she cleaned, cooked, and baked (but she could not read recipes), shopped and did laundry, took care of her pets, and went to church on a regular basis. T165–69. Leapaldt took care of her mother, and cooked and cleaned for her, although Leapaldt's husband and daughter also helped with this. T166. Leapaldt stated that she could not "work on any computer[-]related activity or any activity that requires long[-]term viewing." T153. She watched "some" television, but could not watch for any length of time. T169. Nor could she read for any length of time. T169. Leapaldt could drive by herself, but not at dark, and could not use her computer to pay bills online. T166–68. Leapaldt's husband submitted two reports in March 2010 that contained similar information. T173–188. He stated that Leapaldt would read or watch television for a total of 1 to 2 hours a day, but could not do so for very long. T185. Shortly after these reports, Leapaldt submitted an updated report, stating, among other things, that it was "very seldom now" that she read or watched television. T193.

On May 11, 2010, Leapaldt underwent a consultative psychological exam with psychologist Carroll D. Roland, Ph.D. T273. Leapaldt's psychological status is not at issue in this appeal, and Roland's conclusions need not be discussed. However, during the consultation, Leapaldt made several statements regarding her visual impairments. Leapaldt reported that she could not use the computer for more than 15 minutes, after which she "can't see." And she claimed she would suffer from "severe" headaches if she watched television for more than 30 minutes or attempted to read. T274–75. Leapaldt stated these could last for 2 or more days. T276. She claimed that she had told her doctors about her headaches but none had identified a clear cause. T275. And, for the first time, Leapaldt stated that while she had a driver's license, she did not drive. T276.

Then on June 3, 2010, Leapaldt met with Timothy Lowry, M.D., for a consultative physical examination. T294. Leapaldt explained that she had glasses, but did not wear them because they did not help and caused headaches. T295. She claimed she could read large print but not fine print, such as a newspaper, and that reading for long gave her a headache. T295–96. Although Leapaldt had told Roland she did not drive, she told Lowry that she had a driver's license but did not drive at night. T296. Lowry noted that, with her vision, he did not believe Leapaldt would qualify for a license. T296.

Leapaldt also told Lowry she had suffered from chronic headaches or migraines since she was a young adult. She had never had an MRI scan or been evaluated by a neurologist. Leapaldt claimed that over-the-counter medication did not offer relief, nor did tramadol or Vicodin (stronger, prescription pain medications). T296. Leapaldt reported that her headaches might be "a little bit worse" and that sometimes she had to lie down as a result. T296. Her headaches would occur 5 to 7 days out of the month. T296.

Leapaldt had not brought her glasses with her to Lowry's examination. She informed Lowry that her visual acuity was 20/70 for each eye and both eyes.[5] T297. Lowry observed that Leapaldt could look up and down, but lacked lateral mobility in both eyes (i.e., she could not look side to side). T298. He also noted that although Leapaldt stated she was experiencing a headache that was 9/10 in severity, she did "not objectively appear to be in quite that degree of discomfort." T297–98.

Lowry assessed Leapaldt with (among other things): impaired visual acuity, congenital strabismus secondary to Duane syndrome, COPD, environmental allergies, and chronic headaches. T298. He stated that

> [m]ost limiting to her is her visual acuity and limited range of vision. This limits and impairs [her] ability to read fine print and [she] has limited duration of reading larger print. Ideally an ophthalmologist could evaluate her and determine her visual capabilities but [she] has a significant visual impairment at 20/70 both eyes and each eye individually.

---

[5] Lowry also recorded this as Leapaldt's visual acuity under his "objective" observations, together with, for example, Leapaldt's blood pressure and weight. T297. However, while he apparently performed a general examination of her eyes, it does not appear he actually performed visual acuity testing. The non-examining consultant who later reviewed Lowry's records stated that acuity testing is not performed at general consultative exams such as the one performed by Lowry, "per DDS [Disability Determination Services] standards." T309. In any event, if Lowry did measure Leapaldt's vision, it was only her *uncorrected* vision, and this offers little basis for forming an accurate opinion on her ability to work (assuming, that is, that correction was possible).

- 6 -

T298. Nonetheless, Lowry expected Leapaldt could do light sedentary work. T299. Lowry further opined that

> [g]iven her limited vision[,] I would not recommend she climb on ladders or in situations where she can be at risk for falling . . . . I see no limitations in handling objects. She does have limitations outlined above in terms of seeing. . . . I would not recommend that she drive.

T299.

On June 29, 2010, Melodee Woodard, M.D. reviewed the medical records generated up to that point and completed a physical RFC assessment. T302. Woodard generally found that Leapaldt was not credible and that her claimed symptoms were not supported by the record. T308–309. The Court will discuss Woodard's opinion and reasoning in greater detail below. In October 2010, a second state agency medical consultant reviewed the RFC assessment and summarily concurred with Woodard's findings. T326.

In October 2011, Leapaldt met with optometrist Robert Cleaver, O.D., for an evaluation. T350. She complained of decreased vision, near and far, in both eyes, as well as headaches and difficulty reading. Leapaldt reported that her primary care physician would not prescribe medication for her headaches because they were caused by her visual problems. T350. Leapaldt stated her glasses did not help, and she did not bring them with her. T350.

Cleaver performed a number of standard eye tests. He noted that Leapaldt was unable to move either of her eyes laterally. T350. Cleaver concluded that Leapaldt had a cataract in her left eye. T350. He decided to consult with Bruce Brumm, M.D., an ophthalmologist, about the cataract. T350. Cleaver recommended that Leapaldt consult a physician about her headaches. T350. On November 3, 2011, Cleaver and Brumm again evaluated Leapaldt and concluded that surgery to remove the cataract was warranted. T351. The surgery was set for December 2, 2011. T353. This time, Cleaver recommended that Leapaldt see a neurologist regarding the headaches. T351.

On November 2, 2011, Cleaver responded to a brief set of questions provided by Leapaldt's former attorney. T349. Cleaver stated that Leapaldt's visual acuity was 20/40 in her right eye and 20/50 in her left eye. (Presumably this was *with* correction.) Cleaver wrote that Leapaldt's gross visual fields were intact and within normal limits. He noted that Leapaldt's Duane syndrome limited her ability to move her eyes from side to side, and that there was no treatment for this. T349.

One question asked whether Leapaldt was capable of performing "any job" on a sustained basis in a routine work setting. Cleaver's response was: "Any job --> no. She requires extensive head movement laterally since she is unable to move her eyes in [a] horizontal pattern. Her vision in her left eye is also blurry [secondary] to cataract." T349 (emphasis in original).

Another question asked whether Leapaldt's claim that she experienced headaches after reading, looking at a computer screen, or trying to visually concentrate on something for more than 20 minutes was consistent with her condition. The question also asked Cleaver to explain how such headaches were related to Duane syndrome. Cleaver responded: "It is possible her headaches may be [secondary] to ocular strain [secondary] to blurry vision. Her vision may be blurry from either Duane's Syndrome, cataract [left eye], or both." T349. Finally, Cleaver stated he did not know whether Leapaldt's headaches would respond to migraine medicine, as he did not prescribe such medication. T349.

### III. Hearing Testimony

On November 30, 2011, Leapaldt testified at a hearing before the ALJ.[6] T27. Leapaldt explained that her vision had become worse with age. T36. She stated she could read large things, such as signs, but stated "I cannot read on the computer. I cannot watch TV hardly at all. I cannot read a newspaper or read a book period." T36.

Leapaldt testified that at some point between 2005 and 2006, her vision began to become progressively worse. T36–37. She claimed that after looking at a computer screen or television, or after reading for a short period, her vision would become blurry to the point where she could not read, or see much at all. She would strain to see, which would lead to "massive" headaches. T36–39. Leapaldt testified that although she had suffered from headaches all her life, they had become progressively worse as she has aged and must strain harder to see. She stated that when she had headaches, she was not able to function. T37.

Leapaldt claimed to suffer from headaches weekly. T38. She could read or focus on something for 15 to 20 minutes before she began to experience a headache. Leapaldt claimed her headaches could last from 1 to 3 days or go on for a week. T39. She stated that pain medications had not been effective, including oxycodone and tramadol. T39. Leapaldt testified her doctors had told her migraine medications would not help, as the headaches were caused by straining to see. T37, 40.

---

[6] Leapaldt was represented by counsel at the hearing, although not by her current attorney. *See* T27, 58, 235.

Leapaldt explained that when she worked as the co-owner of the sleep center (until July 2007), she was able to work around these limitations. If her eyes began to hurt or she was having a headache, she would lie down, or go home. T37–38. At times Leapaldt would work from home; at other times her husband or daughter would fill in for her. T38, 41. She testified that during that period, she could work for 20 to 25 hours in a regular work week, but less if she had headaches. T38. When she stayed on as a manager after selling the sleep center, these problems continued and caused to her to miss some days of work. T41–42.

The ALJ next questioned a vocational expert (VE) regarding Leapaldt's ability to perform her previous job and other jobs that existed in the national economy. T47–56. The ALJ asked the VE about a series of hypothetical individuals with different limitations. One of these hypotheticals included all of the limitations that the ALJ eventually incorporated into Leapaldt's RFC. T51; *see* T15. Given that RFC, the VE testified that Leapaldt could perform her past work and other jobs that existed in significant numbers in the national economy. T52. The VE provided representative examples of information clerk and order clerk. T50–51.

The ALJ held a second hearing on January 13, 2012, with the same VE in attendance. T58. Throughout the first and second hearings, the ALJ and Leapaldt's attorney asked the VE about individuals with a number of additional visual limitations. The VE testified that an individual with (roughly) Leapaldt's RFC who needed to take a break for 10 minutes after every 30 minutes to rest her eyes would not be able to perform Leapaldt's past work or any other work.[7] T52–53. The same would be true for an individual: who could not read small print (less than 7-point font), or who was unable to read very small print but could occasionally read ordinary newspaper or book print, or who had "difficult or limited near acuity," that is, who was unable to read newspapers or read lettering or documents on a computer screen, or who was limited to occupations "which require only occasional reading and computer usage or general usage of the eyes as being primary". T53–54, 61–65. On the other hand, the VE testified that while an individual with only "occasional visual acuity" could not perform Leapaldt's

---

[7] Unlike Leapaldt, whom the ALJ restricted to *light* work, the hypothetical individual was capable of performing work at all exertional levels. *Compare* T15 *with* T52. Similarly, two of the other hypotheticals assumed the individual could perform work at all exertional levels and could *occasionally* (as opposed to never) climb on ladders, ropes, or scaffolds. *See* T61. These discrepancies all work to Leapaldt's benefit, as they are based on a hypothetical person who was (other than the additional visual limitations) subject to *less severe* restrictions, and yet was still found incapable of working.

- 9 -

past work, she could perform certain unskilled jobs, such as housekeeping cleaner or dining room attendant.[8] T55–56.

Following the second hearing, Leapaldt's counsel informed the ALJ that Leapaldt had been unable to follow through with the cataract surgery scheduled for December 2011. T235. Leapaldt had been forced to reschedule as her mother was experiencing serious health problems. T235.

## STANDARD OF REVIEW

The Court reviews a denial of benefits by the Commissioner to determine whether the denial is supported by substantial evidence on the record as a whole. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011) (citing 42 U.S.C. § 405(g)). Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion. *Id*. The Court must consider evidence that both supports and detracts from the ALJ's decision, and will not reverse an administrative decision simply because some evidence may support the opposite conclusion. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011). If, after reviewing the record, the Court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the Court must affirm the ALJ's decision. *Id*.

## ANALYSIS

Briefly stated, Leapaldt presents three arguments. All three concern the ALJ's determination of Leapaldt's RFC. First, Leapaldt argues that the ALJ erred in finding her to be less than fully credible in her testimony regarding the limiting effects of her impairments. Second, Leapaldt contends that the ALJ erred in failing to incorporate all of the limits suggested by Lowry into her RFC and in according little weight to Cleaver's opinion. Finally, she argues that the ALJ failed to adequately develop the record regarding her visual impairments.

The Court finds Leapaldt's first two arguments to be without merit. The ALJ did not err in either his credibility evaluation or his decisions regarding the opinions of Lowry and Cleaver. But Leapaldt's third argument

---

[8] However, this appears to contradict the VE's later testimony that an individual, like Leapaldt, who had to avoid concentrated exposure to fumes, odors, dusts, and gases, would *not* be able to perform "jobs like housekeeping" because of the exposure to dust and fumes. T64. Neither side has noted this possible inconsistency, but the Court expects that it will be resolved on remand, if necessary. Additionally, while Leapaldt was limited to *light* work, the VE testified that the dining room attendant position was in the medium exertional category. T56.

is persuasive. The Court finds that the ALJ did not fully develop the record, and will remand the case for further proceedings.

### I. The ALJ's Credibility Assessment

The ALJ found, employing a bit of Social Security boilerplate, that Leapaldt's "medically determinable impairments could reasonably be expected to cause the alleged symptoms;" but that her "statements concerning the intensity, persistence, and limiting effects of the symptoms are not fully credible." T18. In other words, the ALJ found that Leapaldt's vision problems resulted in some limitations, but not to the full extent claimed by Leapaldt. This finding was reflected in the RFC, which included a restriction on driving and climbing, and required Leapaldt to avoid hazards such as unprotected heights. T15. It is also apparent from the RFC that the ALJ found very few of Leapaldt's claimed visual limitations credible. Significantly, the ALJ incorporated no limitations related to reading or computer usage. Nor did the ALJ include any headache-related limitations.

The credibility of a claimant's subjective testimony is primarily for the ALJ to decide. *Vossen v. Astrue,* 612 F.3d 1011, 1017 (8th Cir. 2010). The ALJ's credibility determination will be upheld if the ALJ provides good reasons for discounting the claimant's subjective complaints—such as inconsistencies in the record or the factors set forth in *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)—and those reasons are supported by substantial evidence. *Gonzales,* 465 F.3d at 895–96.

Here, the ALJ considered the appropriate factors and provided several reasons for finding Leapaldt to be not entirely credible. The Court has carefully reviewed the ALJ's entire credibility evaluation, but only a portion need be discussed. The Court finds two of the factors considered by the ALJ to be particularly persuasive.

First, the ALJ noted that Leapaldt made inconsistent statements on matters relevant to the issue of disability. T18. For instance, Leapaldt (and her husband) stated numerous times in March 2010 and June 2010 that she was able to drive by herself, just not at night. T166, 168, 176, 184, 190, 192, 296. But in May 2010, Leapaldt told Roland that she had a driver's license but did not drive, period. T276. The ALJ properly considered such inconsistencies in weighing Leapaldt's testimony. *See Gray v. Apfel*, 192 F.3d 799, 804 (8th Cir. 1999). This is not to suggest that Leapaldt was being untruthful; but it does, at the very least, suggest that she is not the most reliable narrator of her own conditions.[9]

---

[9] Similarly, Leapaldt testified at the hearing that she stopped driving in March *2009*. T40, 46. She may have meant to say 2010—Leapaldt did mix up the years when stating she last saw Diego-Wright in 2008, when the correct year was 2009. T44, 240, 243. But if Leapaldt

- 11 -

The ALJ also found that the record contained "evidence of exaggerated symptoms and limitations, particularly as demonstrated" in Leapaldt's visit to Lowry. T18. As noted above, Lowry observed that while Leapaldt claimed to be experiencing a headache that was 9/10 in severity, she did "not objectively appear to be in quite that degree of discomfort." T297–98. Nor was this the only sign of exaggerated symptoms. For example, Leapaldt claimed that when she attempted to work on December 8, 2009, she ended up with a "massive headache that lasted for four days." T42. It is curious then, that when she visited Diego-Wright a week later, there is no record of her reporting headaches. T240–43. That might be chalked up to an omission in Diego-Wright's brief notes. But the same cannot be said for the fact that, in the entire medical record, there is no sign Leapaldt ever sought treatment for debilitating headaches.

An ALJ's credibility finding will be upheld so long as it is adequately explained and supported. *Choate v. Barnhart*, 457 F.3d 865, 871 (8th Cir. 2006). The Court finds that, on the evidence available, the ALJ did not err in his credibility evaluation.[10] But as the Court explains below, this case must be remanded for further development. On remand, new evidence may necessitate a re-examination of Leapaldt's credibility.

## II. Weighing the Medical Opinions

Leapaldt next argues that the ALJ erred in not incorporating all of the limits that Lowry placed on her, and in discounting Cleaver's opinion. Leapaldt's first argument is without merit and quickly resolved. The ALJ's handling of Cleaver's opinion, on the other hand, implicates aspects of Leapaldt's next argument: that the ALJ failed to develop the record. Nonetheless, the Court finds that on the evidence before the ALJ, it was not error to accord Cleaver's opinion little weight.

---

meant to say 2010, her testimony would still have contradicted her contemporaneous reports from that period and her statement to Lowry in June 2010.

[10] Leapaldt also argues that the ALJ altogether ignored the reports from her husband concerning her symptoms and functioning. Filing 12 at 25; *see* T173–188. However, the ALJ stated that he had considered all of the exhibits in the record, and cited to the range of exhibits containing those reports. T11. It is enough that the ALJ considered the reports; he was not required to discuss each and every piece of evidence submitted. *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010). In any event, the reports more or less repeated the information found in Leapaldt's own reports. And the ALJ, having found Leapaldt less than credible, was equally empowered to reject the cumulative reports of her spouse. *Hogan v. Apfel,* 239 F.3d 958, 962 (8th Cir. 2001).

### A. Lowry

The ALJ accorded Lowry's opinion "significant weight," finding that it was "well supported by medically acceptable clinical and laboratory techniques and consistent with other substantial evidence in the record." T19. In describing the limitations Lowry placed on Leapaldt, the ALJ stated:

> Lowry opined the claimant was capable of lifting and carrying up to 25 pounds. Environmental allergies would preclude working in environments with dust, fumes, or temperature extremes. *No other limitations were provided* with the exception [of] no driving and no climbing of ladders or ropes in connection with visual acuity.

T17 (emphasis supplied).

Leapaldt argues that this was a misstatement of Lowry's findings. In a technical sense, it may have been. In the same paragraph where he restricted Leapaldt from climbing ladders, Lowry also stated, "[s]he does have limitations outlined above in terms of seeing." T299. By that, Lowry was referring to his statement on the preceding page, that Leapaldt's limited visual acuity and range of vision "limits and impairs [her] ability to read fine print and [she] has limited duration of reading larger print." T298.

The Court is convinced that, despite the misstatement of Lowry's findings, the ALJ properly considered and weighed Lowry's opinion. The Court reviews for substance over form: a "deficiency in opinion-writing technique" does not require the Court to set aside an administrative finding when that deficiency had no bearing on the outcome. *Buckner v. Astrue*, 646 F.3d 549, 559 (8th Cir. 2011). Although the ALJ could have expressed himself with more clarity, the Court has been able to follow his reasoning, and finds his intended meaning to be clear.

The ALJ accorded Lowry's opinion (which included more than his statements regarding Leapaldt's visual impairments) significant weight because it was supported by "acceptable clinical and laboratory techniques." T19. Lowry did not perform anything but a cursory eye exam on Leapaldt. However, Lowry did perform several tests that related to Leapaldt's strength, her asthma and breathing ability, and her exertional abilities. T297–98. Based on those findings, Lowry opined that Leapaldt was limited to "light sedentary work with lifting and carrying up to 25 pounds," with no limitations in moving, but with environmental limitations due to her allergies and breathing issues. T299. The ALJ largely incorporated these findings into his RFC, and it is clear that these were the findings the ALJ gave significant weight. *See* T15.

By contrast, Lowry's opinions regarding Leapaldt's visual impairments were based largely (if not entirely) on Leapaldt's subjective reports. Other than noting she could not move her eyes laterally, it does not appear Lowry performed any tests or observed anything that could have informed a more detailed opinion regarding Leapaldt's vision. *See* T297–98 and n.5, *supra*. Instead, Lowry recommended that an ophthalmologist evaluate Leapaldt to determine the extent of any visual impairment. T298.

Reading the ALJ's opinion in this context, it is readily apparent that the ALJ did not consider Lowry's statements regarding Leapaldt's ability to read to be on par with the other limitations Lowry placed on Leapaldt. And that makes sense. The limitations Leapaldt wishes the ALJ had included were supported primarily by her subjective reports, which the ALJ properly found less than credible. Thus, the ALJ did not err in his treatment of Lowry's opinion.

## B. Cleaver

The ALJ accorded "little weight" to Cleaver's opinion, as he saw Leapaldt only twice "and appeared to base his opinion on the subjective complaints of the claimant rather than objective findings." T19. Leapaldt disagrees with this result, but has provided no persuasive objection to the ALJ's reasoning.

Cleaver's opinion was extremely terse, and provided no explanation for how he arrived at his conclusions, nor any clinical or medical data in support. In that sense, his opinion does appear to be based on Leapaldt's subjective complaints. If Cleaver's opinion was based on subjective reports, rather than objective medical evidence, then the ALJ was permitted to accord it less weight. *See McDade v. Astrue*, 720 F.3d 994, 999–1000 (8th Cir. 2013). Even if there was an objective basis for Cleaver's opinion, he failed to explain what it was. And that too provides a proper basis for discounting his opinion. *Id.*

Besides those shortcomings, there is another problem with Cleaver's opinion: it provides no insight on how Leapaldt's visual problems affected her ability to work. In response to the question whether Leapaldt could work, Cleaver gave an ambiguous response: "Any job --> no." T349 (emphasis in original). Presumably this means that Cleaver believed Leapaldt could work *some* jobs. This was followed by an equally unhelpful explanation: "She requires extensive head movement laterally since she is unable to move her eyes in [a] horizontal pattern. Her vision in her left eye is also blurry [secondary] to cataract." T349. The first part of Cleaver's explanation is not terribly helpful. Leapaldt has never claimed that extensive head movement is what gives her trouble at work. And the second part of Cleaver's

- 14 -

explanation—that the vision in Leapaldt's left eye is blurry—is too vague to help in determining the effect of Leapaldt's vision on her ability to work.

The remainder of Cleaver's opinion is similarly lacking in clarity. Cleaver stated that Leapaldt's visual acuity was 20/40 and 20/50 (left and right). These numbers mean little to the Court. The American Optometric Association states that 20/30 to 20/60 vision is considered "mild vision loss, or *near-normal* vision." Am. Optometric Ass'n, *Low Vision*, http://www.aoa.org/x5240.xml (last visited January 22, 2014) (emphasis supplied). But this same source goes on to explain:

> Visual impairments take many forms and exist in varying degrees. It is important to understand that visual acuity alone is not a good predictor of the degree of problems a person may have. Someone with relatively good acuity (e.g., 20/40) can have difficulty functioning, while someone with worse acuity (e.g., 20/200) might not be having any real problems.

*Id.* And true enough, Cleaver's opinion had more to say regarding Leapaldt's vision. Cleaver concluded that the blurriness in Leapaldt's vision (whether caused by the cataract alone, by Duane syndrome, or by a conjunction of the two) could cause ocular strain, which could in turn lead to headaches. T349.

The Court finds it significant that Cleaver, the only eye specialist to examine Leapaldt and offer an opinion as to her functioning, found that Leapaldt had objectively verifiable eye conditions that could be causing blurriness and ocular strain. Such symptoms might very well interfere with Leapaldt's ability to read (regardless of whether they caused headaches, or whether those headaches were truly debilitating). But the same problem remains: Cleaver's opinion does not describe the effect of these symptoms on Leapaldt's ability to work. The opinion thus lacks the sort of detail that would make it helpful to the ALJ or a reviewing court. It raises many more questions than it answers: How blurry was Leapaldt's vision? What exactly could she see, and for how long? What impact did corrective lenses have, and what, if any, accommodations could have allowed her to work? Unfortunately, it is not only Cleaver's opinion that fails to answer these questions, but also the record as a whole.

### III. Failure to Develop the Record

Reviewing the record as a whole, the Court is convinced that Leapaldt's eye conditions had some effect on her ability to work. That is not in dispute. The ALJ found that these conditions meant Leapaldt could not perform jobs requiring her to drive or climb. But as it stands, the record does not contain

substantial evidence on the full impact of Leapaldt's eye conditions on her ability to work. Thus, substantial evidence does not support the ALJ's decision to find that there were no *further* limits on Leapaldt's visual capabilities.

The claimant bears the burden of persuasion to prove disability and to demonstrate her RFC. *Stormo v. Barnhart,* 377 F.3d 801, 806 (8th Cir. 2004). However, Social Security hearings are non-adversarial, and the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case. *Id.*; *see also* 20 C.F.R. § 404.1520b. This duty extends even to cases like Leapaldt's, where an attorney represented the claimant throughout the administrative proceedings. *Johnson v. Astrue,* 627 F.3d 316, 319–20 (8th Cir. 2010).

If the record is not sufficient for the ALJ to determine whether the claimant is disabled, he must develop the record further. *McCoy v. Astrue,* 648 F.3d 605, 612 (8th Cir. 2011). However, the ALJ is only required to seek additional evidence or clarification if a "crucial issue" is undeveloped. *Stormo,* 377 F.3d at 806.

The crucial issue in this case is the effect of Leapaldt's eye conditions on her ability to work, that is, on her RFC. The VE's testimony demonstrates how important it was to properly determine Leapaldt's visual abilities. For example, the VE testified that an individual with Leapaldt's RFC would be found disabled if she needed to take a break for 10 minutes after every 30 minutes to rest her eyes, if she could not read small print, or if she was limited to occupations "which require only occasional reading and computer usage or general usage of the eyes as being primary". T52–54, 61–65 T53–54, 61–65. This testimony also shows the type of information that was needed to make an informed decision in this case—information not found in the record.

The ALJ found that none of these restrictions applied to Leapaldt. But the ALJ's determination of a claimant's RFC must be supported by some medical evidence of the claimant's ability to function in the workplace. *Cox v. Astrue,* 495 F.3d 614, 619 (8th Cir. 2007). When there is little evidence of an alleged impairment and "substantial evidence to the contrary," an ALJ can make an informed decision without having to develop the record further. *See Byes v. Astrue,* 687 F.3d 913, 917 (8th Cir. 2012). But the Court cannot find any substantial basis in the present record that could have informed the ALJ's decision.

While it is true that Cleaver only examined Leapaldt twice, he was also the *only* medical source (and eye specialist) to conduct a recent and detailed eye examination of Leapaldt. And while his opinion suffers from the shortcomings discussed above, he at least found it possible that Leapaldt's eye conditions could be causing blurriness and ocular strain. That, in turn,

could have affected Leapaldt's ability to perform any of the tasks discussed by the VE above. The record contains only three other significant sources of information on Leapaldt's vision: Lowry's report, Leapaldt herself, and Woodard's assessment. And these sources, considered together and as a whole, do not provide enough information to properly determine the impact of Leapaldt's impairments on her ability to work.

### A. Lowry

Lowry offered only the broadest limitations: no driving and no climbing on ladders. T299. But he did not state these were Leapaldt's *only* limitations. Instead, he recommended that an eye specialist examine Leapaldt to determine the actual extent of her visual limitations. T298. And despite according Lowry's opinion "significant weight," the ALJ did not follow this recommendation.

### B. Leapaldt

The Court has already found that the ALJ properly discounted Leapaldt's testimony. If Leapaldt's vision problems were purely subjective matters, such as pain or fatigue, then it might have been sufficient for the ALJ to simply find that Leapaldt was not credible and her complaints not supported by the record. But visual acuity is something that can be objectively measured. Similarly, the Court sees no reason that the ability to read for a prolonged period cannot be measured. Thus, it is important to distinguish between Leapaldt's claims regarding her headaches, which are wholly subjective, and her vision. The only evidence of headaches comes from Leapaldt. But there is objective evidence that Leapaldt's vision is impaired. And there is reason to believe that this impairment could further erode Leapaldt's RFC.

It is also important to note that while the ALJ found Leapaldt's daily activities inconsistent with her complaints of disabling symptoms and limitations,[11] there is no evidence of activities that are inconsistent with her claimed visual limitations. In that regard, Leapaldt's reported activities were

---

[11] Leapaldt testified that she suffered from headaches up to 5 to 7 times a month, that they could last for 1 to 3 days or up to a week, and that the headaches rendered her unable to function. T37, 39, 296. Despite this, she was able to regularly clean, cook, shop, do laundry, take care of her sick mother, as well as regularly attend church. T165–69. And although she reported more frequent headaches in September 2010, she reported no changes in her daily activities. T209. The ALJ properly found that these activities were inconsistent with Leapaldt's complaints of debilitating headaches. *See Halverson v. Astrue*, 600 F.3d 922, 932 (8th Cir. 2010). But the Commissioner has not explained how any of those activities would be inconsistent with a vision problem that limited the ability to focus or read.

- 17 -

more or less consistent with her symptoms. She consistently stated that her vision made it difficult to read, watch television, or use a computer, and that she only performed such acts on a limited basis. In other words, Leapaldt's daily activities do not provide substantial evidence that she lacks the visual impairments she claims.

### C. Woodard

That leaves only the opinion of Woodard. After reviewing the medical records generated until June 2010, Woodard found generally that Leapaldt was not credible and that her claimed symptoms were not supported by the record. T308–309. As a general matter, the opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence. *Vossen*, 612 F.3d at 1016. Here, there are specific reasons to give Woodard's report little weight. Most importantly, when Woodard made her conclusions, she did not have access to the entire record, and in particular, the notes from Leapaldt's visits to Cleaver. This undermines a key aspect of Woodard's report.

Woodard wrote, "[w]hile consideration is made to delay adjudication pending attempt to obtain possible additional information, the [claimant's] impairment of Duane's syndrome is a congenital anomaly that is static over time." T309. And, Woodard reasoned, Leapaldt's allegations that she could not read for long without her eyes becoming blurry were inconsistent with Leapaldt's significant work history and the pathophysiology of Duane syndrome. T309.

First, the Court notes that Woodard, like Lowry, apparently believed more information would have been beneficial. Second, Woodard's conclusions rested in part on her view that Leapaldt was dealing with only a static, congenital impairment. But as the record shows, somewhere between Leapaldt's 2009 visit to Diego-Wright and her 2011 visits to Cleaver, there was at least some change in her eye conditions. Over that period, the recommended course of treatment for the cataract in Leapaldt's left eye shifted from observation to surgical intervention. And Cleaver stated that this cataract, possibly in combination with Leapaldt's lack of eye mobility, could have resulted in blurriness and ocular strain. Woodard did not have the opportunity to consider key aspects of the record, and her opinion therefore does not constitute substantial evidence.

Thus, having reviewed the record as a whole, the Court is left with no clear understanding of what Leapaldt's visual capabilities actually were. Failing to develop the record is reversible error when the record does not contain enough evidence to determine the impact of a claimant's impairment on her ability to work. *Byes*, 687 F.3d at 916. Vision was the central issue in

this case. It was the focus of Leapaldt's submissions and testimony throughout the administrative process. *See, e.g.*, T35, 36–43, 56–57, 145–154, 165–200, 206, 274, 295. Despite that, the record contains very little evidence of how those visual impairments affected Leapaldt's ability to work.

Failure to develop the record warrants a remand where such failure is unfair or prejudicial. *Snead v. Barnhart*, 360 F.3d 834, 839 (8th Cir. 2004). Because further evidence on the effect of Leapaldt's visual impairments may have altered the outcome of the disability determination, the Court finds that a remand is appropriate. *See id.*

## CONCLUSION

The Court has reviewed the administrative record and finds that the ALJ erred in not developing the record regarding Leapaldt's visual impairments. Accordingly,

IT IS ORDERED:

1. This case is reversed and remanded to the Commissioner for further proceedings consistent with this opinion.

2. A separate judgment will be entered.

Dated this 22nd day of January, 2014.

BY THE COURT:

John M. Gerrard
United States District Judge